

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-7-2004

# Hampe v. Butler

Precedential or Non-Precedential: Precedential

Docket No. 03-1438

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Hampe v. Butler" (2004). *2004 Decisions.* Paper 752.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/752

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-1438

_____


RONALD HAMPE; JOSHUA JESSE;
MARK VANWAY; MICHELE
AIKENS; JOHN WHITCOMB,
Individually and on behalf of all
Similarly Situated Individuals; MON
VALLEY UNEMPLOYED
COMMITTEE; INTERNATIONAL
UNION OF ELECTRICAL SALARIED
MACHINE AND FURNITURE
WORKERS–COMMUNICATION
WORKERS OF AMERICA,
    Appellants


v.


JOHNNY J. BUTLER, SECRETARY,
PENNSYLVANIA DEPARTMENT OF
LABOR AND INDUSTRY; ELAINE L.
CHAO, SECRETARY, U.S.
DEPARTMENT OF LABOR

_____

On Appeal from the United States
District Court
for the Western District of Pennsylvania
(Civil Action No. 01-cv-00622)
District Judge: The Honorable Robert J.
Cindrich

_____

Argued: October 21, 2003

Before: ALITO, FUENTES, and
ROSENN, Circuit Judges
(Opinion Filed: April 7, 2004)

_____

Scott A. Bradley, Esq. [ARGUED]
Deputy Attorney General
OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Ave.
Pittsburgh, PA 15219

*Counsel for Appellee Butler*

Allen H. Feldman, Esq.
Associate Solicitor for Special Appellate
and Supreme Court Litigation
Nathaniel I. Spiller, Esq.
Deputy Associate Solicitor
Gary K. Stearman, Esq. [ARGUED]
Senior Appellate Attorney
U.S. Department of Labor
Room 2700
200 Constitution Ave., N.W.
Washington, DC 20210

Bonnie R. Schlueter, Esq.
Office of the U.S. Attorney
700 Grant St.
Suite 400
Pittsburgh, PA 15219

*Counsel for Appellee Chao*

Evalynn B. Welling, Esq. [ARGUED]
Community Justice Project
1705 Allegheny Building
429 Forbes Ave.
Pittsburgh, PA 15219

John Stember, Esq.
Stember Feinstein Krakoff
1705 Allegheny Building
429 Forbes Ave.
Pittsburgh, PA 15219

*Counsel for Appellants*

_____

OPINION OF THE COURT
_____

FUENTES, Circuit Judge:

The individual plaintiffs in this case are industrial workers who reside and worked in western Pennsylvania. Each lost his or her job as a result of foreign competition or because his or her job had been moved to another country. As a result, the workers enrolled in re-training programs through the federal Trade Adjustment Assistance Program ("TAA") of the Trade Act of 1974. Under the Act, the workers were entitled to reimbursement for training-related travel expenses if they had to travel outside their regular commuting area. However, the Pennsylvania Department of Labor and Industry ("Labor & Industry"), the state agency that administers the federal program, required the workers to sign waivers of the travel expense allowance before they could be approved.

In April 2001, the workers filed suit against both Labor & Industry and the United States Department of Labor ("DOL") seeking, among other things, injunctive relief and a declaration that they were entitled to a retroactive reimbursement. The District Court denied all relief and dismissed the workers' complaint.[1] We conclude that the workers are entitled to an order: (1) declaring that Pennsylvania's waiver policy violated the Trade Act, and (2) directing the Secretary of Labor to order the Pennsylvania Department of Labor & Industry to redetermine the workers' travel expense claims.

## I. **Facts and Procedural Background**

---

[1] The District Court also denied a motion by Plaintiffs for class certification, based on the denial of the underlying relief. The class certification issue has not been appealed as an independent issue, so we do not discuss it here.

The Trade Act of 1974, 19 U.S.C. § 2291-98 ("Act"), provides unemployment compensation, training, job search, relocation, allowances and other benefits to workers who have lost their jobs as a result of competition from imports. The Act authorizes the Secretary of Labor to contract with state employment agencies to administer the federal benefits program. Dislocated workers can apply to DOL through the state agency for reimbursement of their training costs, including the costs of traveling to their training centers provided that the centers lie outside their normal commuting area. 20 C.F.R. § 617.28(a). Labor & Industry administers the program in Pennsylvania as an agent of DOL. The named plaintiffs, Ronald Hampe, Joshua Jesse, Mark Vanway, Michele Aikens and John Whitcomb ("Plaintiffs") are all dislocated workers under the Act who sought coverage for their training and travel from Labor & Industry.[2] Plaintiffs, all residing in rural areas, were enrolled in training facilities located more than 50 miles from their homes. They allege that before they could be approved for a training program, the state required anybody commuting more than 50 miles away to sign waivers agreeing to accept only $5 per day for

commuting expenses. Pl. Br. at 11. They further claim that Labor & Industry adopted this "negotiated travel allowance" policy as a means of reducing its training costs, and that the policy was approved by DOL. Labor & Industry and DOL, however, allege that Labor & Industry and Plaintiffs negotiated the $5 per day amount based on the mutual recognition that the commuting costs were abnormally high.

Plaintiffs filed suit in the District Court in April 2001. Five months later, DOL issued Training and Employment Guidance Letter ("TEGL") 5-01, which clarified that states could not negotiate travel allowances under the Trade Act. Labor & Industry adopted this clarification, discarded the negotiated travel allowance policy effective November 15, 2001, and began to pay full federal mileage to individuals in training as of November 15. Labor & Industry did not, however, reimburse any of the Plaintiffs for their pre-November 15 commuting costs.

In their complaint, Plaintiffs pressed three claims. First, Plaintiffs demanded retroactive relief from Labor & Industry: namely, reimbursement for pre-November 15 commuting costs above $5 per day. Alternatively, Plaintiffs requested relief from DOL for the pre-November 15 policy on the grounds that DOL endorsed the negotiated travel allowance policy.[3]

———————————

[2] There are two additional named plaintiffs: Mon Valley Unemployed Committee is an advocacy group representing unemployed or underemployed individuals, and the International Union of Electrical Salaried Machine and Furniture Workers–Communication Workers of America is Plaintiffs' union.

———————————

[3] Our dissenting colleague bases his opinion on the premise that there is no evidence of any DOL approval of the negotiated travel allowance policy. The

Specifically, Plaintiffs sought a declaration that "DOL's policy of approving negotiated travel allowances prior to September 2001 violated DOL's own regulations and, thus, the dislocated workers are entitled to relief against the Secretary under the Administrative Procedures [sic] Act[4] for the travel allowances which were withheld from them before November 15, 2001." Pl. Br. at 7. Finally, Plaintiffs sought an injunction against the current, post-November 15 one-half tuition policy, under which Labor & Industry allegedly denies any training program for which travel costs exceed more than half of training tuition and fees.

The District Court dismissed all of Plaintiffs' claims. First, the District Court found that Plaintiffs' claim for reimbursement from Labor & Industry was barred by sovereign immunity. In particular, the District Court rejected Plaintiffs' argument that sovereign immunity was inapplicable simply because only federal funds were at issue. The District Court then dismissed the reimbursement claim against DOL as barred by the Act because, according to the District Court, redeterminations of Act benefits can only be sought in state court. Finally, the District Court concluded that any claims for prospective relief were mooted by the November 15 adoption of TEGL 5-01. Plaintiffs timely appealed.

## II. <u>Jurisdiction and Standard of Review</u>

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over the District Court's final judgment pursuant to 28 U.S.C. § 1291. Our standard of review over the District Court's grant of summary judgment is plenary. <u>Morton Int'l, Inc. v. A.E. Staley Mfg. Co.</u>, 343 F.3d 669, 679 (3d Cir. 2003).

---

record belies this premise, however. Specifically, Ronald Zilonka, the Labor & Industry official in charge of Trade Act allowances, testified that DOL administrator Ronald Kile approved the negotiated allowance practice on a state-by-state basis. Zilonka Dep. at 37-38 (App. at 70-71). Moreover, Zilonka testified that he continued to send reports on Labor & Industry's use of the negotiated allowance policy to federal officials, and that the federal officials actually asked him for further data on how the policy was working. Zilonka Dep. at 38-41 (App. at 71). Although our dissenting colleague is correct that the negotiated allowance policy does not seem to have *originated* from the DOL, the above testimony makes it clear that the DOL knew of and condoned the negotiated travel policy, and even encouraged the policy by asking Labor & Industry to keep the DOL apprised of its progress. Notably, neither the DOL nor Labor & Industry contests this, nor does any record evidence refute the DOL's clear tacit approval of the negotiated travel policy.

[4] Plaintiffs invoke the APA as a procedural mechanism to challenge DOL's actions, <u>see</u> 5. U.S.C. § 702. Plaintiffs' specific substantive challenge is that DOL has contravened its own regulations and the dictates of the Act.

-4-

### III. Analysis

### A. The Trade Act Does Not Bar Relief Against DOL In This Case

The District Court's dismissal of Plaintiffs' claim against DOL was based on the grounds that the Trade Act confines claims for redeterminations of benefits to state courts. In its decision, the District Court noted that the Act "vested state courts with exclusive jurisdiction over claims challenging a state agency's application of federal guidelines to the benefit claims of individual employees." International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock, 477 U.S. 274, 285 (1986) (hereinafter "Brock I"). Plaintiffs contend, however, that the federal district court has jurisdiction to hear their claims. They argue that their instant suit against DOL is not for a redetermination of benefits, but for an order declaring that DOL improperly endorsed Labor & Industry's negotiated travel allowance policy, which had been implemented in violation of federal law.

Plaintiffs are correct. In Brock I, the Supreme Court noted that nothing in the Act would prevent a suit against DOL for violation of federal law in federal court: "While the Act vested state courts with exclusive jurisdiction over claims challenging a state agency's application of federal guidelines to the benefit claims of individual employees, there is no indication that Congress intended [the Act] to deprive federal district courts of subject-matter jurisdiction . . . to hear statutory or constitutional challenges to the federal guidelines themselves." In other words, even though the determination of individuals' benefits may be confined "to state administrative and judicial processes, claims that a program is being operated in contravention of a federal statute or the Constitution can nonetheless be brought in federal court." Id. (internal citations omitted). Specifically, a federal court can hear statutory challenges that will influence the outcomes of redetermination proceedings, although it cannot hear direct requests for redetermination. Id. at 284. The language from Brock I does not simply allow for suits seeking to invalidate statutes or explicit federal guidelines; rather, it explicitly provides for "claims that *a program is being operated in contravention of a federal statute*." Id. at 285 (internal citations omitted) (emphasis added). Thus, in this case, Plaintiffs' claim is not barred by the fact that it is not challenging the official statute or regulations. As the Supreme Court noted in Brock I, "[a]s we find [the Act] to pose no bar to petitioners' claims, we see no jurisdictional impediment to this suit in federal court challenging a federal official's interpretation of a federal statute. In view of the extent to which state agencies are bound to adhere to the Secretary's directives with respect to the administration and interpretation of the Trade Act, such a direct challenge is not only proper, but appropriate." Id. at 285-86 (internal citation omitted).

DOL offers four arguments in an attempt to distinguish Brock I. First, DOL contends that in Brock I, the Secretary was still advocating the invalidated policy, whereas here DOL has declared in TEGL 5-01 that the pre-November 15 policy violated federal law, thereby mooting any controversy. We note, however, that Plaintiffs have not yet been reimbursed for their pre-November 15 travel costs, and so their entire request for relief has not been mooted. A directive from DOL to Labor & Industry to redetermine benefits to the extent permitted under state law is a discrete step beyond merely conceding the illegality of the pre-November 15 policy: doing the latter does not render a request for the former action moot.

Second, DOL asserts that Plaintiffs actually benefitted from the negotiated travel allowance policy because they were able to negotiate fair amounts for travel. Plaintiffs dispute this assertion, of course, and it is, in any case, irrelevant as such a factual determination must be made by the agency charged with redetermining benefits. Third, DOL notes that in Brock I, no states were joined as parties and so relief through the Secretary was the only option. This fact, however, does not distinguish Brock I from the instant case because, in light of sovereign immunity, Labor & Industry is just as inaccessible here as the state agencies were during Brock I.[5] Fourth, DOL contends that the

redetermination directive in Brock I was merely ancillary relief. DOL does not, however, give any reason as to why it can only be ancillary, rather than the main relief granted Plaintiffs here.

DOL raises two final points in opposition to Plaintiffs' request for relief. First, it asserts that it cannot order Labor & Industry to redetermine benefits because Labor & Industry has already resolved that benefits cannot be redetermined under state law. This argument is unpersuasive. As Plaintiffs point out, the question of whether Pennsylvania law forecloses redeterminations has not been litigated in state court. Moreover, DOL's doubt over whether Labor & Industry will conduct redeterminations is not enough to preclude relief. While we do not suggest that the District Court can order Labor & Industry to redetermine benefits in cases in which redetermination is barred by state law, we see no obstacle to the entry of an order similar to that approved in Brock I.

In Brock I, the Supreme Court did not suggest that the federal courts could require a redetermination of benefits in cases in which "a final state judgment . . . preclude[d] further consideration of . . . eligibility claims." 477 U.S. at 284. Instead, the Court held that certain workers who had yet to receive such a judgment had "a live interest" in challenging the Labor Department guidelines. Id. The Secretary of Labor expressed concern that state agencies, unless joined as parties, would not comply with a DOL directive to

[5] The conclusion that Labor & Industry is immune from suit shall be discussed at greater length in Part C of this

opinion.

-6-

redetermine benefits. Brock I, 477 U.S. at 291-92. The Supreme Court, however, opined that it had "little doubt that the state agencies, which have agreed to administer [trade readjustment allowance] benefits as agents of the United States, would obey the Secretary's directive to process anew any [trade readjustment allowance] claims wrongfully denied as a result of" the erroneous policy. Id. at 292 (internal quotations omitted). The Supreme Court stated that state agencies might even be compelled to follow the Secretary's directive due to their agency agreement to administer the Trade Act as agents of the United States. Id.

On remand from Brock I, the Court of Appeals for the District of Columbia Circuit further considered the question of what relief is appropriate for Trade Act violations pursuant to invalid DOL policies. See generally International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock, 816 F.2d 761, 768-69 (D.C. Cir. 1987) (hereinafter "Brock II"). The D.C. Circuit refused to compel redetermination of benefits, but it directed the district court to order the Secretary of Labor to promulgate guidelines embodying a correct interpretation of the Act and to advise state agencies of this new interpretation. Id. at 769. In addition, the court of appeals stated:

> The trial court should also direct the Secretary to order agency officials to take appropriate action to enforce this correct interpretation of the statute in pending and future

cases, and, *consistent with state law, to correct any erroneous eligibility determinations that may have occurred as a result of his incorrect interpretation.*

Id. (emphasis added). In the instant case, therefore, both Brock I and Brock II (hereafter collectively referred to as "Brock") would sanction orders to DOL to direct Labor & Industry to reprocess benefits in accordance with state law. Accordingly, while the District Court in this case could not hear requests for individual eligibility determinations, it did have jurisdiction to hear a challenge to DOL's approval of Labor & Industry's negotiated waiver policy. Under the teachings of Brock I, Plaintiffs could therefore sue for an order declaring that the pre-November 15 policy violated the Trade Act.

Finally, DOL suggests that even if the Court determines that a redetermination directive is appropriate, the Court can remand to the District Court to determine whether that is a proper declaratory/injunctive remedy. In this case, however, we see nothing further required of the District Court: all parties agree that the pre-November 15 policy violated the Trade Act, and no party has offered a suitable alternative for relief. Accordingly, it is entirely proper for this Court to order DOL to direct Labor & Industry to redetermine benefits.

**B. The One-Half Tuition Policy Does Not Violate the Trade Act**

Plaintiffs next allege that Labor & Industry improperly maintains a blanket "one-half tuition policy" under which Labor & Industry denies any training program for which travel costs exceed more than half of training tuition and fees. In other words, Plaintiffs contend that the one-half tuition policy does not allow for individualized evaluations of training programs with high relative travel costs, but dismisses such programs by rote. The District Court did not discuss the allegedly blanket nature of the policy, but held that the policy conformed to the applicable DOL regulation: "Training at facilities outside the worker's normal commuting area that involves transportation or subsistence costs which add substantially to the total costs shall not be approved *if other appropriate training is available*." 20 C.F.R. § 617.22(a)(6)(iii)(C) (emphasis added).

Plaintiffs argue that the District Court was in error, and that a blanket policy rejecting training programs without individualized determinations of appropriate training options violates federal law. Although we agree with Plaintiffs that the Trade Act does not allow for blanket policies, we agree with the District Court's conclusion that the one-half tuition policy comports with the Trade Act because there is no evidence that the one-half tuition policy is a blanket policy. The Trade Act requires approval of training that "is suitable for the worker and available at a reasonable cost." 19 U.S.C. § 2296(a)(1)(F). The statute's legislative history makes it clear that training

programs cannot be disapproved through blanket rules, but only on a case-by-case basis. H.R. Conf. Rep. No. 100-576, at 700-01 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1733-34. The DOL regulations implement this case-by-case approach: "Available at a reasonable cost means that training may not be approved at one provider when, all costs being considered, training substantially similar in quality, content and results can be obtained from another provider at a lower total cost within a similar time frame." 20 C.F.R. § 617.22(a)(6)(ii). Thus, Labor & Industry cannot institute a blanket denial policy, but must take each individual's particular training request into consideration on its own merits. Just as clear, however, is the regulations' mandate that training costs, including travel costs, be minimized without sacrificing training quality, content or results.

Here, there is no evidence that the one-half tuition policy's attempt to control costs has come at the expense of training quality, content or results. DOL and Labor & Industry have consistently maintained that the one-half tuition policy is not a blanket policy at all, but is a rule of thumb that is susceptible to exceptions on a case-by-case basis. According to DOL and Labor & Industry, the one-half tuition policy is merely a recognition that Labor & Industry will normally be able to provide alternate suitable training for applicants who wish to enroll in programs for which travel costs exceed more than one-half of the tuition costs. In the extreme case where that is not possible, DOL and Labor

& Industry insist that the one-half tuition policy would not bar reimbursement for the chosen program.

Plaintiffs reply that Ronald Zilonka, the Labor & Industry official in charge of Trade Act allowances, admitted to the blanket nature of the policy in his deposition. A careful reading of the deposition, however, reveals no such admission. Zilonka explained that, normally, other available training could be found for someone whose program violated the one-half tuition policy. Zilonka Dep. at 90 (App. at 84). Zilonka was clear, however, that the one-half tuition policy did not act as a total bar to acceptance of any programs.

> Q. This is just a blanket rule, it doesn't make any difference what the tuition of the training is, if the cost of travel is more than that, you can't get it.

> A. Seeing that the transportation cost takes away from training cost [sic] of other individuals across the Commonwealth of Pennsylvania, *each case is looked at on an individual basis.*

> But it has been our policy since 1993/1994 that any requested training where the cost of transportation rises to a point of half the cost of transportation—or equal to the cost of transportation—that every effort will be made to find other training within commuting distance.

Id. (emphasis added). Thus, Zilonka expressly repudiated opposing counsel's statement that the one-half tuition policy is absolute, and emphasized that Labor & Industry merely does its best to find alternate training for those whose programs have high travel costs.[6] In conclusion, we find that the one-half tuition policy legitimately attempts to control costs and is in harmony with the individualized character of the Trade Act regulations. We accordingly affirm the District Court's conclusion in this regard.

### C. Plaintiffs' Request for Reimbursement from Labor & Industry is Barred by Sovereign Immunity

As we previously noted, the District Court dismissed Plaintiffs' request for monetary relief from Labor & Industry on the grounds that it was barred by the

---

[6] Plaintiffs also claim that Hampe was refused his choice of training program and not presented a suitable alternative. Plaintiffs present no evidence, however, to support this allegation.

-9-

doctrine of sovereign immunity, which protects states from suit by individuals. See generally, e.g., Federal Maritime Comm'n v. South Carolina State Ports Auth., 535 U.S. 743 (2002). Plaintiffs argue that sovereign immunity does not apply here because the money that would be used to pay Plaintiffs is coming from the federal government, and therefore Plaintiffs are not targeting any of Pennsylvania's money. See Robinson v. Block, 869 F.2d 202, n.11 (3d Cir. 1989); Bennett v. White, 865 F.2d 1395, 1408 (3d Cir. 1989). The holdings in Robinson and Bennett, however, predated the Supreme Court's most recent round of decisions on sovereign immunity, which leaves no doubt that sovereign immunity applies even when the money at stake is from the federal rather than the state treasury.

For example, in Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 431 (1997), the Supreme Court rejected the argument that sovereign immunity would not apply "because any award of damages would be paid by the Department of Energy ("DOE"), and therefore have no impact upon the treasury of the State of California." Plaintiffs attempt to distinguish Doe on the grounds that California had to pay damages and would then be indemnified by the DOE, whereas, in the instant case, the money would come directly from the federal treasury. This distinction, however, does not help Plaintiffs because the Supreme Court has since made clear that the purpose of sovereign immunity is not merely to protect intrusion into the state's treasury,

but to protect against the indignity of any kind of suit whatsoever. Federal Maritime Comm'n, 535 U.S. at 765-66. Thus, no matter who pays the reimbursement bill, sovereign immunity bars Plaintiffs from suing Labor & Industry to get that reimbursement.

## IV. Conclusion

After carefully considering the arguments discussed above, we conclude that the District Court correctly dismissed the claims against Labor & Industry, but that its dismissal of the claim for injunctive relief against DOL was in error. We therefore remand this case to the District Court for further proceedings consistent with this opinion.

Hampe v. Butler

No. 03-1438

ROSENN, Circuit Judge, Concurring and Dissenting.

I concur and join in the majority's opinion except Part III.A (The Trade Act Does Not Bar Relief Against DOL). However, I cannot agree that the plaintiffs are entitled to an injunction against the United States Department of Labor (DOL). The fundament of plaintiffs' complaint against the DOL is that it "authorized and/or acquiesced in Pennsylvania's policies of requiring waivers of transportation subsidies by the applicants under the Trade Adjustment Assistance (TAA) Program and in setting a travel subsidy cap." However, there is no

evidence of record supporting this general allegation asserted "[u]pon information and belief."[7] The majority points to none.

"An injunction is an extraordinary remedy, which should be granted only in limited circumstances." <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.</u>, 290 F.3d 578, 586 (3d Cir. 2002) (internal quotation marks omitted). Not only must the right to an injunction be clear, but also it must be supported by an adequate factual record. Furthermore, where the DOL has agreed with the plaintiffs that Pennsylvania's previous travel reimbursement policy was invalid and the state agency has revised its policy, the plaintiffs have not shown that they lack adequate remedy in state proceedings for reimbursement of previously wrongfully reduced or waived travel allowances. "No court of equity [should] . . . allow its injunction to issue [unless the petitioner] has no adequate remedy by the ordinary processes of the

---

[7] In paragraph 80 of their complaint, the plaintiffs assert a legal conclusion against the DOL: DOL violated the case-by-case determination policy of the Trade Act and acted beyond its authority under the Trade Act "<u>[i]f</u> by [its GAL 15-90] it required Pennsylvania to set a statewide total-cost-of-training limit." (Emphasis added). Significantly, the plaintiffs qualify their assertion with the word "if." Subsequent discovery has yielded no evidence to support this supposition.

law." <u>Utah Power & Light Co. v. I.C.C.</u>, 747 F.2d 721, 728 (D.C. Cir. 1984) (quoting <u>Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Board of Public Works</u>, 172 U.S. 32, 38 (1898)). Because the plaintiffs' right to this drastic remedy is not supported by any evidence and unwarranted, I respectfully dissent.

## I.

At the outset of my dissenting opinion, it is important that I highlight my disagreement with the majority opinion. I do not dispute that there can be a cognizable claim against the DOL <u>if</u> the plaintiffs have submitted any sufficient evidence to show that the DOL's regulations, guidelines or regulations contravened the Trade Act. The majority acknowledges, however, that the plaintiffs are "not challenging the official statute or regulations." An examination of the complaint confirms this conclusion. Apart from the one-sentence assertion asserted "[u]pon information and belief," the remainder of the complaint directed at the DOL consists of mere legal conclusions.

The majority quotes a few sentences from the Supreme Court's decision in <u>Int'l Union, UAW v. Brock</u>, 477 U.S. 274 (1986). Specifically, the majority quotes the following sentences from <u>Brock</u>: "claims that a program is being operated in contravention of a federal statute or the Constitution can nonetheless be brought in federal court"; and federal court has jurisdiction to hear a suit "challenging a federal official's interpretation of a federal statute." <u>Id.</u> at

285-86. The majority opinion fails to discuss how the Brock language applies to the plaintiffs' claims. Instead, it moves simply from the recognition that there can be a cognizable claim against the DOL to its conclusion that there is a federal claim here. The plaintiffs have not challenged any federal official's interpretation of any Trade Act provisions in this case. Nor have the plaintiffs challenged any federal TAA program.

A plain reading of the plaintiffs' complaint and briefs shows that they are only challenging Pennsylvania's previous specific policy, adopted by the Pennsylvania state agency, of limiting travel allowance to $5.00 per day or requiring some of the plaintiffs to sign waivers of travel allowance. They do not challenge the DOL's general policy that states should set reasonable limit to TAA training cost, including travel cost, as required by federal regulations. Federal regulations require that TAA training be, among other things, at a reasonable cost. 20 C.F.R. 617.22(a)(6). Furthermore, federal regulations provides that approval of TAA training be at "the lowest reasonable cost." 20 C.F.R. 617.22(b). See generally DOL's Training and Employment Guidance Letter (TEGL) No. 5-01 (September 2001). The plaintiffs neither challenge the federal regulations nor TEGL No. 5-01; they merely challenge Pennsylvania's previous specific policy of capping or requiring waiver of travel allowances.

The plaintiffs, however, have used the term "negotiated" travel policy to refer to Pennsylvania's specific travel policy; for them, "negotiated" policy is synonymous with the state agency's specific policy. The defendants themselves have also used the term "negotiated" policy loosely. Even though nomenclature should not be decisive, it can be misleading. It is important, therefore, to set the term and the record straight. The only evidence relied on by the plaintiffs in support of their claims against the DOL and by the majority in support of its conclusion, is the deposition testimony of Ronald Zilonka, director of the state agency's TAA program, which I will summarize and discuss more fully below.[8]

Zilonka's testimony shows that some DOL officials generally promoted the "negotiated" policy of setting "reasonable" limits to travel cost and cited the Pennsylvania's "negotiated" policy as an example. However, Zilonka denied specifically that the federal officials ever suggested or promoted Pennsylvania's specific policy and practice of setting per diem limit or requiring waiver of travel reimbursement. He testified specifically that DOL left the states to devise their specific travel policy and practice. A fair reading of Zilonka's deposition testimony shows that the term "negotiated" policy, as used in that deposition, is not synonymous with the specific policy adopted by the Pennsylvania state agency. Zilonka's

---

[8] Significantly, the plaintiffs have offered no deposition testimony of any federal officials in charge of the TAA program.

-12-

testimony has not shown, and there is no evidence otherwise, that DOL officials ever promoted, suggested, or required Pennsylvania to adopt its specific policy. The context of his testimony shows that the DOL officials promoted only the general federal requirement of setting reasonable limits to travel cost. This requirement not only does not violate the TAA but also conforms to congressional intent and federal regulations.

It must be reiterated that the plaintiffs are not challenging this general federal requirement. They are challenging only the specific travel policy adopted by Pennsylvania. Congress did not enact the TAA to assist only Pennsylvania workers who lost jobs as a result of foreign competition; it was a national program. Thus, it is a logical assumption that communications relating to policies, guidelines, and their interpretation pertaining to the program would be by letter or written guideline modification of the DOL. That was the DOL's practice. When it issued its TEGL No. 5-01 in September 2001, the DOL communicated by written letter. The plaintiffs' complaint refers to another announcement in 1990 by the DOL and it, too, was by general administrative letter, GAL 15-90. The plaintiffs, in this case, however, cannot point to any documentary evidence to support their position against the DOL.

The deposition testimony of Zilonka, cited and relied on by the plaintiffs and the majority, does not show either that the DOL ever promoted or approved, let alone caused, directed or required, the Pennsylvania specific travel policy and practice. In my view, the majority has merely relied on the plaintiffs' confusing use of the term "negotiated" policy and the Brock language to justify its summary grant of injunction against the DOL. The majority, however, has not addressed the issue of whether the DOL has ever promoted or directed the Pennsylvania state agency to adopt and implement its specific travel policy of setting per diem cap and requiring waiver. Because the plaintiffs' complaint is merely directed at the specific state policy, and the record shows that the specific policy was devised solely by the state agency, the plaintiffs have failed to show a cognizable claim against the DOL.

II.

Zilonka testified that in 1995 he and representatives of four other states and the District of Columbia had a "conversation" with Russ Kile, a former TAA program administrator at the DOL. Zilonka testified that Kile told the group that "states had the right to negotiate travel costs if that would help lower the cost of training to enable someone to receive the training they want to." Zilonka testified that he "felt" that Kile had the authority to "make that decision." There is no evidence of Kile's authority and its extent. Even if he had unlimited authority, Zilonka never testified that Kile informed the state agencies that they had unlimited authority to limit travel costs of participants in the TAA program and obtain waivers. Zilonka further testified that he decided to change the state travel

-13-

cost policy after discussing with various unnamed individuals within the state agency. He did not recall, however, that he had received any "confirming" memorandum from either Kile or the DOL subsequent to Kile's alleged "conversation" with the state representatives. Zilonka did not send any "confirming" memorandum to the DOL or Kile.

Zilonka testified additionally that in a National Trade Adjustment Assistance Coordinator's conference held in Philadelphia in May 1996, federal officials conveyed to all attendees that "negotiated travel policy" was "the best way to lower costs of training" and they cited the Pennsylvania policy as an example. The message he obtained from the speeches by the federal officials, none of whose names he could recall at the time of the deposition, was that the states should look at ways to bring travel costs to a "reasonable" or "comfortable level. However, Zilonka denied specifically that the federal officials ever "suggested" the practice of setting a $5.00 per diem limit on travel allowances. He did not "recall" either that they ever "recommended" or "suggested" the practice of requiring the "total waiver of travel allowances." He denied further that the federal officials ever gave him any "parameters" or "guidance" as to how the state should specifically devise its travel cost policy. They left the matter entirely to the states.

Zilonka testified that since the Philadelphia conference, federal officials have never requested any report from him regarding the state's policy or practice of travel cost reimbursement. Nor was he aware of any verbal or written communications from the DOL regarding the "negotiated" travel reimbursement policy subsequent to the Philadelphia conference. As far as he knew, the Philadelphia conference was the only time that DOL officials discussed travel reimbursement, except possibly for some "informal discussion" with a few federal officials about the state's travel reimbursement policy or practice. He did not recall that the federal officials ever told him to discontinue the state policy or requested him to submit any report to the DOL regarding the state policy. Any discussion with the federal official was done "informally."[9]

Zilonka's recollection of his conversation with Kile shows only that he encouraged states to bring travel costs to a "reasonable" or "comfortable" level. Even if Kile were empowered to do so, there is nothing in Zilonka's deposition that proves that Kile ever suggested the $5.00 per diem limit or the total waiver of travel allowances. Thus, the plaintiffs have neither alleged nor presented any evidence proving that the DOL's guidelines, regulation or policies caused, required, or directed the Pennsylvania agency to adopt its specific policy of a per diem cap or

_____

[9] Significantly, the plaintiffs have offered no deposition testimony of any federal officials or officials from other state agencies who attended the Philadelphia conference to support their claims.

-14-

waiver of travel allowances.

Despite the confusing and undifferentiated use of the term "negotiated" policy, Zilonka's testimony does not show that the DOL approved or encouraged Pennsylvania's specific policy and practice. Nonetheless, even if we assume, arguendo, that the DOL was aware of, or acquiesced in, Pennsylvania's specific practice, mere awareness or acquiescence, without more, does not constitute a cognizable claim against the DOL under Brock. Neither the plaintiffs nor the majority have cited any authority to support such a proposition.

### III.

Finally, the grant of injunctive relief against the DOL is needless because the plaintiffs have not submitted their claim to the state agency since the DOL issued TEGL 5-01. The DOL agreed with the plaintiffs that Pennsylvania's prior policy and practice was invalid. The DOL has issued TEGL 5-01 to clarify the federal regulations governing travel payments. The plaintiffs have not challenged TEGL 5-01. Furthermore, the plaintiffs have not alleged or shown that they have submitted requests to the state agency for reimbursement of travel allowances the state previously denied them under its original policy. They have not alleged that the state agency has denied any such requests and that the denial is caused by any federal policy, regulation or guideline binding on the state. Under these circumstances, where the plaintiffs have adequate remedies in state proceedings and where there is neither allegation nor evidence that it would be futile for the plaintiffs to seek compensation from the state agency, it is groundless for this court to grant injunctive relief against the DOL.

### IV.

For the foregoing reasons, I respectfully dissent from the majority's grant of injunctive relief. I would affirm the District Court's grant of summary judgment in favor of the DOL, not on the ground of mootness relied on by that court, but for the reasons set forth above. Dillinger v. Caterpillar, Inc., 959 F.2d 430, 449 n.2 (3d Cir. 1992) ("[T]he general rule that a district court decision may be affirmed on an alternative ground is well established.").

-15-